1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ESTATE OF CECILIA LAM, et al.,

         Plaintiffs,

    v.

CITY AND COUNTY OF SAN
FRANCISCO, et al.,

        Defendants.

Case No.  16-cv-02594-KAW

**ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT**

Re: Dkt. No. 23

    "This is a tragic case of murder-suicide."  (Defs.' Mot. at 1, Dkt. No. 23.)  On October 10, 2014, Ms. Cecilia Lam was fatally shot by her ex-boyfriend, Cedric Young Jr.  On the night of the shooting, Ms. Lam called the police six different times about Young, and the police responded three times.  The officers never informed Ms. Lam of her right to perform a citizen's arrest.  Following Ms. Lam's death, Plaintiffs Estate of Cecilia Lam, Shut Fan Lam, and Joseph Lam filed the instant suit against Defendants City and County of San Francisco, Officer Chhunmeng Tov, Officer Adam Lobsinger, Officer Viet Ha, Officer David Lee, and Sergeant Steven Haskell.  In the operative complaint, Plaintiffs assert claims based on: (1) wrongful death based on negligence; (2) survivorship; and (3) 42 U.S.C. § 1983, based on Defendants Ha's, Lee's, and Haskell's alleged deliberate indifference to Ms. Lam's and Plaintiffs' Fourteenth Amendment rights to familial association.  (First Amended Complaint ("FAC") ¶¶ 49, 57, 59, 62, Dkt. No. 1, Exh. B.)

    On February 2, 2017, Defendants filed the instant motion for summary judgment.  Upon consideration of the parties' filings, as well as the arguments presented at the April 20, 2017 motion hearing, and for the reasons set forth below, Defendants' motion for summary judgment is GRANTED.

# I.    BACKGROUND

## A.    Factual Background

Since 2006, Ms. Lam lived at 581 Natoma Street, Apartment A, with a rotating group of roommates.  (Casper Decl., Exh. B ("Ramirez Dep.") at 13:9-25, Dkt. No. 28.)  During this time, Ms. Lam had an on-again, off-again relationship with Cedric Young, Jr., also known as "Jay." (Ramirez Dep. at 18:9-25.)  In February 2012, Young was arrested for domestic violence against Ms. Lam, but was not prosecuted.  (Casper Decl., Exh. 12.)  Ms. Lam and Young lived together between June 2013 and August 2014, when Ms. Lam asked Young to leave.  (Casper Decl., Exh. A ("McKay Dep.") at 40:5-13.)  In early October 2014, Young moved back in.  (McKay Dep. at 42:12-15, 43:11-14, 43:25-44:3.)

On October 9, 2014, Ms. Lam's roommate, Mr. Michael Ramirez, came home around 7:00 p.m. to find Young acting strangely, although he did not appear to be drunk.  (Ramirez Dep. at 27:19-3, 29:14-30:1.)  Mr. Ramirez went to his room, where he would later hear Ms. Lam and Young arguing.  (Ramirez Dep. at 31:21-32:24.)  When Mr. Ramirez left his room thirty to forty minutes later, Young was outside the closed front door, while Ms. Lam was talking to Young from the top of the stairs.  (Ramirez Dep. at 34:24-35:8.)

Ms. Lam then went to Mr. Ramirez and said, "I need you to look at this."  (Ramirez Dep. at 36:4-8.)  Ms. Lam showed Mr. Ramirez a pot of spaghetti sauce that she was cooking, and said, "I think Jay may have tried to poison me."  (Ramirez Dep. at 36:8-11.)  Mr. Ramirez saw something that looked like peas.  (Ramirez Dep. at 37:22-23.)  Ms. Lam scooped some out and put it on a burrito wrapper, and then smudged it and said that it was not normal.  (Ramirez Dep. at 38:9-16.)  Mr. Ramirez agreed it did not look normal.  (Ramirez Dep. at 38:17-18.)  They then went to his room and Googled rat poison, and found that it had a similar look, including a lime green appearance.  (Ramirez Dep. at 39:3-8.)

In the meantime, Mr. Ramirez stated that things were "escalat[ing] with Jay outside the door," including "a lot of pounding, knocking, holding the -- his finger down on the buzzer." (Ramirez Dep. at 44:10-14.)  Mr. Ramirez observed that Ms. Lam appeared like she did not want to overreact, but that she was frightened.  (Ramirez Dep. at 45:15-46:3.)

2

1    Around 8:37 p.m., Ms. Lam called 911, informing the dispatcher that she and her

2    boyfriend were fighting, and that she had asked him to leave her home but that he would not.

3    (Walker Decl., Exh. A, Dkt. No. 23-9.)  Ms. Lam said that things were "starting to escalate."  (*Id.*)

4    When the dispatcher asked for her boyfriend's name, Ms. Lam stated: "I'm sorry. He's fine.  He's

5    on the phone.  He's actually leaving now."  (*Id.*)  The dispatcher asked if Ms. Lam would like the

6    police to be sent, and Ms. Lam responded: "No. I think we're okay."  (*Id.*)

7    At 9:14 p.m., Ms. Lam called 911 again, stating that she had "called earlier and it was

8    about an escalating Domestic Violence issue between my boyfriend and I."  (Walker Decl., Exh.

9    B.)  Ms. Lam explained that they had gotten into a fight the prior night and things had escalated,

10   and that Young had been drinking all day.  Ms. Lam said that Young was waiting for a ride, and

11   that she had told him that if he rang the doorbell one more time, she was going to call the police

12   but that he would not stop ringing the doorbell.  (*Id.*)  When the dispatcher asked if an officer had

13   come out, Ms. Lam replied, "Uh, no, 'cause I--at that point he had left . . . ."  (*Id.*)  The doorbell

14   can then be heard buzzing in the background.  (*Id.*)  Ms. Lam provided additional identifying

15   information, and responded in the affirmative when the dispatcher asked if she wanted to speak to

16   the officers when they arrived.  The call was recorded as a "417 DV," with "DV" indicating a

17   domestic violence incident.  (Walker Decl., Exh. C.)

18   At 9:19 p.m., Mr. Ramirez called 911, stating: "there's some crazy man ringing our

19   doorbell," and that he was "trying to break in, get inside--"  (Walker Decl., Exh. G.)  Mr. Ramirez

20   explained that the man was the boyfriend of his roommate, and stated that "this guy is insane--and

21   he's trying to get inside."  (*Id.*)  He stated that he "d[id ]not know what the hell is going on and it's

22   scaring the hell out of me . . . ."  (*Id.*)  Following Mr. Ramirez's call, the dispatcher upgraded the

23   call to a 418 DV.  (Walker Decl., Exh. C.)

24   At 9:33 p.m., Ms. Lam called 911, stating that she and her roommate had called and that

25   she was "getting a little bit more, um, scared because it's--it's escalating, domestic situation?"

26   (Walker Decl., Exh. D.)  The dispatcher informed her that the police had arrived.  (*Id.*)

27   Defendants Officer Tov and Officer Lobsinger had arrived at 581 Natoma Street at approximately

28   9:30 p.m.  (*Id.*, *see also* Casper Decl., Exh. 4 ("Plfs.' Tov Dep.") at 29:8-16.)  Officer Tov and

1  Officer Lobsinger did not hear the actual recordings of Ms. Lam's and Mr. Ramirez's calls to

2  dispatch, but only had the information relayed through audio, dispatch, or through the computer.

3  (Hannawalt Decl., Exh. G (Defs.' Tov Dep.") at 36:1-13.)  Officer Tov understood the call for

4  service to concern an argument between a boyfriend and girlfriend, and that the boyfriend was

5  outside, ringing the doorbell.  (Plfs.' Tov Dep. at 37:1-6, 41:6-14.)  He does not recall if dispatch

6  had informed him that the reporting party had called previously.  (Plfs.' Tov Dep. at 37:7-10.)

7  Based on the computer readout, Officer Tov also understood that the boyfriend was possibly

8  intoxicated, that the girlfriend and boyfriend had gotten into a fight earlier, and that the boyfriend

9  had left before police were dispatched.  (Plfs.' Tov Dep. at 41:22-42:4.)

10  The officers found Young sitting on the front steps of 581 Natoma Street, between the

11  metal gate[1] and the front door.  (Plfs.' Tov Dep. at 57:8-13; Casper Decl., Exh. 5 ("Plfs.' Lobsinger

12  Dep.") at 26:17-18.)  Officer Lobsinger asked if he was Cedric or Mr. Young, and Young replied

13  in the affirmative.  (Plfs.' Lobsinger Dep. at 27:21-23.)  Officer Lobsinger asked Young to step out

14  onto the street, and performed a pat-search for weapons but found none.  (Plfs.' Lobsinger Dep. at

15  27:25-28:4.)  The officers then began asking Young about his relationship with Ms. Lam, and their

16  earlier argument.  (Plfs.' Lobsinger Dep. at 29:5-22.)  Officer Lobsinger recalls Young appearing

17  to be "somewhat under the influence" and "somebody who had been drinking," including walking

18  with an unsteady gait, body swaying slightly, and speech slurred.  (Plfs.' Lobsinger Dep. at 31:11-

19  25.)  While Young was being interviewed, Ms. Nicole McKay, another of Ms. Lam's roommates,

20  returned to 581 Natoma Street.  (Casper Decl., Exh. 1 ("McKay Dep.") at 70:10-13.)  She asked

21  what was happening and was told it was a "domestic dispute and they basically had everything

22  under control."  (McKay Dep. at 70:18-24.)  Ms. McKay stated that Young appeared to be drunk.

23  (McKay Dep. at 71:11-13.)

24  Ms. Lam came down after the pat search.  (Plfs.' Tov Dep. at 65:21-22.)  Officer Tov

25  spoke to Ms. Lam at the alcove, with the gate shut behind them.  (Plfs.' Tov Dep. at 66:5-16.)

26  Officer Tov states that Ms. Lam told him that Young was her ex-boyfriend and they had an

27

28  _____
[1] To enter the building from Natoma, an individual would have to pass through a locked metal
gate.  (Ramirez Dep. at 14:9-14.)

4

1   argument earlier in the evening, and that she had asked him to move out and that he was waiting

2   for his uncle to pick him up. (Plfs.' Tov Dep. at 66:20-24.) When Officer Tov asked her if Young

3   was trying to break in, she said no. (Plfs.' Tov Dep. at 66:25-67:4.) Officer Tov asked what

4   Young had been doing, and Ms. Lam replied that he was ringing the doorbell incessantly,

5   bothering her roommates. (Plfs.' Tov Dep. at 67:9-11.) Officer Tov inspected the door for signs

6   of damage, but found none. Officer Tov asked about Ms. Lam's and Young's history, and Ms.

7   Lam explained that they had been dating for about two years before breaking up, and that Young

8   had then called and said he was homeless. Ms. Lam felt sorry for him, and allowed him to stay

9   with her. (Plfs.' Tov Dep. at 68:4-13.)

10          At that point, Mr. Ramirez came outside and said that Young had tried to put rat poison in

11  Ms. Lam's spaghetti. (Plfs.' Tov Dep. at 68:16-19; Ramirez Dep. at 52:18-21.) According to

12  Officer Tov, Ms. Lam denied that Young would do such a thing, saying that he would not do

13  anything to hurt her. (Plfs.' Tov Dep. at 68:20-22.) Ms. Lam insisted she had made the spaghetti

14  and that it had not been tampered with. (Plfs.' Tov Dep. at 68:23-24.) Ms. Lam presented Officer

15  Tov with what looked like a used plate that had spaghetti sauce, as well as a green speck which

16  she said was garnish. (Plfs.' Tov Dep. at 69:9-12.) Ms. Lam also stated that she had eaten it and

17  felt fine, and denied it being poisoned. (Plfs.' Tov Dep. at 69:13-15.) Officer Tov performed a

18  visual inspection of the spaghetti sauce, but thought the green substance looked like garnish.

19  (Plfs.' Tov Dep. at 70:18-24.) Officer Tov also looked for perspiration or decoloration, or

20  anything that would indicate Ms. Lam had eaten something out of the ordinary. (Plfs.' Tov Dep. at

21  72:1-3.) Ms. Lam also indicated that it had tasted bitter. (Plfs.' Tov Dep. at 73:21-22.) Based on

22  Ms. Lam's assertions, Officer Tov concluded that the spaghetti had not been poisoned. (Plfs.' Tov

23  Dep. at 73:25-74:4.) Officer Tov did not inform any other officers about the poisoned spaghetti

24  until after the murder-suicide. (*See* Plfs.' Tov Dep. at 110:5-21, 131:11-18.)

25          Mr. Ramirez disputes this account. He states that he went down with the burrito wrapper

26  because he had the impression that Ms. Lam was downplaying everything to the police and was

27  trying to send them on their way. (Ramirez Dep. at 52:1-9.) He said that when he told the officer

28  that Young had tried to poison Ms. Lam with rat poison, "her eyes got as big as saucers."

1   (Ramirez Dep. at 52:18-21.)  Ms. Lam briefly agreed with him, saying that she believed her

2   boyfriend may have put in rat poison, and that she had "forgot to tell you that."[2]  (Ramirez Dep. at

3   52:22-24, 58:2-5, 59:7-9.)  Mr. Ramirez does not recall the officer responding, but "[t]he general

4   feeling . . . from the interaction with all three of [them] there was that he just . . . didn't want to

5   believe it.  He didn't care."  (Ramirez Dep. at 58:17-24.)  Mr. Ramirez asked if there was an

6   evidence bag to put the burrito wrapper in so that it could be checked for poison, "[a]nd the officer

7   sort of did this half shrug, almost [like] he was grinning like he wasn't taking [Mr. Ramirez]

8   seriously."  (Ramirez Dep. at 52:25-53:7.)  The officer then laughed and did a "sort of gesture."

9   (Ramirez Dep. at 53:15-17.)  Mr. Ramirez went back upstairs, taking the burrito wrapper with

10  him.  (Ramirez Dep. at 53:18-19, 57:7-9.)[3]

11          Based on their respective interviews, Officer Lobsinger and Officer Tov determined the

12  situation was not a domestic violence situation.  Officer Lobsinger testified that based on the

13  individual interviews, they determined there was no physical violence and no credible threats, only

14  a verbal argument.  (Hannwalt Decl., Exh. J ("Defs.' Lobsinger Dep.") at 38:6-12.)  Officer Tov

15  stated in his deposition that normally domestic violence issues did not involve parties that were as

16  calm as what he experienced with Ms. Lam and Young.  (Defs.' Tov Dep. at 74:8-10.)  In

17  particular, Ms. Lam was "very calm, very normal," and "[h]er demeanor was not alarming . . . in

18  any way."  (Defs.' Tov Dep. at 74:12-13.)  Further, Ms. Lam denied any sort of physical contact,

19  that Young had tried to hurt her in any way, that she felt threatened, or that she was a victim.

20  (Defs.' Tov Dep. at 76:5-13, 80:13-16.)  Neither officer informed Ms. Lam of the right to effect a

21  citizen's arrest under California Penal Code § 836(b).  (Defs.' Tov Dep. at 80:2-4; Defs.' Lobsinger

22  Dep. at 40:20-41:1.)

23          Ms. Lam stressed to Officer Tov that she wanted Young to stop ringing the doorbell, and

24  she agreed that the solution was that he should take BART to Richmond, where Young's uncle

25  _____

26  [2] Defendants object to the statement "I forgot to tell you that" as inadmissible hearsay.  (Defs.'
    Mot. at 4 fn. 1.)  The Court overrules the objection; the statement is admissible for the effect on
27  the listener, Officer Tov.

28  [3] Following Ms. Lam's murder, a toxicology test was performed on the pasta sauce, which came
    back positive for bromethalin, an active ingredient in rat poison.  (Casper Decl., Exh. 16.)

1    lived. (Defs.' Tov Dep. at 82:15-18.) Officer Tov walked across the street to Young, who agreed

2    to leave. (Defs.' Tov Dep. at 82:19-20.) Ms. Lam followed, and offered Young BART fare,

3    which he declined. (Defs.' Tov Dep. at 82:21-23; Defs.' Lobsinger Dep. at 41:8-11.) The officers

4    watched Young walk away while Ms. Lam went back inside. (Defs.' Tov Dep. at 85:19-20; Defs.'

5    Lobsinger Dep. at 41:21-25.)

6        Right after Ms. Lam went back inside, Young returned. (Ramirez Dep. at 64:18-25.) Mr.

7    Ramirez recalls "pounding and ringing and more of the same." (Ramirez Dep. at 66:17-20; *see*

8    *also* McKay Dep. at 79:10-13.) Ms. McKay went down and asked through the gate what he

9    wanted. (McKay Dep. at 79:14-15.) Young responded that he had a bag of stuff, and wanted her

10   to hand it to him. Ms. McKay said she would go get it for him. She found a trash bag full of

11   items and went back to the gate. When she opened it, Young pushed the gate in and came into the

12   entryway, and began "sitting there and slurring and like he's not doing anything. Just acting

13   drunk." (McKay Dep. at 79:20-24.) Ms. McKay refused to let him back in and went upstairs, and

14   Young started ringing the doorbell again. Ms. McKay then spoke to him through the front door;

15   Young kept asking to talk to Lam, and "reached inside his pocket and it was like something black

16   and shiny." (McKay Dep. at 80:13-22, 81:3-5.) Young kept trying to force the door open on Ms.

17   McKay, and Ms. McKay kept pushing the door back in on him. She then called out to Mr.

18   Ramirez to call the police. (McKay Dep. at 81:5-10.) Ms. McKay believed the black and shiny

19   object was a gun, and she informed Mr. Ramirez of it, who responded, "Are you sure it was a

20   gun?" (Hannawalt Decl., Exh. K ("Defs.' McKay Dep.") at 97:3-9. Ms. McKay also told Ms.

21   Lam, who was dialing the phone, calling the police. (Defs.' McKay Dep. at 97:13-23.)

22       At 10:01 p.m., Ms. Lam called the police. (Walker Decl., Exh. E.) The call was coded

23   "418DV." (*Id.*) At 10:10 p.m., the call was upgraded to a "602DV," with the comment, "Male

24   now trying to break in the front door." (*Id.*) At about 10:20 p.m., Officers Lobsinger and Tov

25   again responded. (*Id.*) The officers found Young sitting on the steps. (Plfs.' Tov Dep. at 98:4-5.)

26   They conducted a pat search, and brought him across the street. (Plfs.' Tov Dep. at 98:13-15.)

27   Officer Tov observed that compared to their first interaction, Young's gait was more unsteady, to

28   the point that "[h]e almost fell over when he sat down on the planter box." (Plfs.' Tov Dep. at

101:19-21.)

Officer Lobsinger remained with Young across the street, while Officer Tov interviewed Ms. Lam on the building landing. (Plfs.' Tov Dep. at 102:8-14.) Ms. Lam told Officer Tov that Young was still ringing the bell, but denied that he was trying to break in. (Plfs.' Tov Dep. at 102:16-20.) She said Young had been drinking. (Plfs.' Tov Dep. at 102:23.) Officer Tov observed that while Ms. Lam's demeanor was "a little bit more agitated," it "was not different from the first encounter." (Plfs.' Tov Dep. at 106:25-107:2.) Ms. Lam indicated she wanted Young to leave, and Officer Tov went back across the street to where Officer Lobsinger and Young were. (Plfs.' Tov Dep. at 104:18-23.) Again, Officer Tov did not inform Ms. Lam of her right to do a citizen's arrest per California Penal Code § 836(b). (Plfs.' Tov Dep. at 108:19-22.) The officers determined that the second call did not rise to the level of a domestic violence situation. (Plfs.' Tov Dep. at 106:3-15.) The officers decided to arrest Young for disorderly conduct and public intoxication. (Lobsinger Decl. ¶ 5, Dkt. No. 23-6; Tov Decl. ¶ 5, Dkt. No. 23-7.)

Defendant Sergeant Haskell also responded to 581 Natoma around this time; he was not aware of the prior calls to 581 Natoma Street. (Hannawalt Decl., Exh. H ("Defs.' Haskell Dep.") at 40:18-21; Casper Decl., Exh. 8 ("Plfs.' Haskell Dep.") at 30:14-24, 31:21-32:3.) Sergeant Haskell found Officer Lobsinger with Young, and saw Officer Tov speaking to Ms. Lam. (Plfs.' Haskell Dep. at 30:14-24.) Officer Tov came over and told Sergeant Haskell that all they had was public intoxication. (Plfs.' Haskell Dep. at 42:3-13.) Young was arrested for public intoxication. (Plfs.' Tov Dep. at 109:8-13.) The officers did not inform Ms. Lam that Young was arrested for public intoxication. (Plfs.' Lobsinger Dep. at 55:15-25.)

After Young was detained, Officer Tov conducted a records check. (Plfs.' Tov Dep. at 46:13-16.) Officer Tov saw that Young's prior arrest for domestic violence in February 2012. (Plfs.' Tov Dep. at 54:18-55:24.) Officers Tov and Lobsinger took Young to the San Francisco County Jail, where he was held in the "drunk tank." (Plfs.' Tov Dep. at 110:25-111:5.) Young and his belongings were searched; no gun was found. (Lobsinger Decl. ¶ 5; Tov Decl. ¶ 5.)

In the meantime, Ms. Lam's roommates had a house meeting around midnight. (McKay Dep. at 89:4-6.) Ms. Lam mentioned getting home security and protection for herself, saying that

1   she did not trust Young anymore.  (McKay Dep. at 89:19-24.)  Ms. McKay and Ms. Lam planned

2   on going to the courthouse to fill out a restraining order.  (McKay Dep. at 90:14-17.)[4]

3       Young was released four hours later, the standard detention time for a public intoxication

4   arrest.  (Plfs.' Lobsinger Decl. at 59:12-23; Plfs.' Haskell Decl. at 63:25-64:9.)  At about 4 a.m.,

5   Young returned to 581 Natoma Street.   Ms. Lam called the police twice.  (Walker Decl., Exh. F.)

6   The call was coded a "602," with no "DV" designation.  (*Id.*)  The event history detail did indicate

7   there was a prior 418DV.  (*Id.*)

8       Defendants Officer Lee and Officer Ha responded to the call, arriving at 4:15 a.m.  (Ha

9   Decl. ¶ 4, Dkt. No. 23-1; Lee Decl. ¶ 4, Dkt. No. 23-5.)  Officers Lee and Ha were given a suspect

10  name and history, including that he had been taken to county jail for being drunk in public.

11  (Casper Decl., Exh. 6 ("Plfs.' Lee Dep.") at 31:23-32:3.)  Officer Ha recalls being given

12  information on the way to 581 Natoma Street that they were going on a return call, and that there

13  was an earlier 418 DV.  (Casper Decl., Exh. 7 ("Plfs.' Ha Dep.") at 39:20-24.)  Officer Lee also

14  recalled something about prior calls for service.  (Plfs.' Lee Dep. at 35:2-6.)  Officer Lobsinger

15  also sent Officer Lee a text along the lines of: "Head's-up, we've been there before."  (Plfs.'

16  Lobsinger Dep. at 63:16-25.)

17      When the officers arrived, they found Young sitting on the steps within the exterior gate.

18  (Plfs.' Lee Dep. at 36:5-17.)  Young had a black bag with him.  (Plfs.' Lee Dep. at 51:22-23.)  The

19  officers ordered him to come out to Natoma Street, which he did.  (Plfs.' Ha Dep. at 55:9-11.)  The

20  officers conducted a pat-down and then asked Young what he was doing there, and Young

21  responded that he lived there and wanted to get some clothing for work. (Plfs.' Ha Dep. at 56:22-

22  57:6; Plfs.' Lee Dep. at 39:18-23, 52:13-14.)  Young told them there were prior calls made, and

23  that he had just been released from and came from the drunk tank.  (Plfs.' Ha Dep. at 57:12-16;

24  Plfs.' Lee Dep. at 40:20-23.)

25      Officer Ha asked dispatch to have Ms. Lam come downstairs to speak to her.  (Plfs.' Ha

26  Dep. at 69:21-25.)  After Ms. Lam came out, she told Officer Ha that Young had been banging on

27  _____

28  [4] Mr. Ramirez does not recall a conversation about getting a restraining order, but does recall Ms. Lam was planning on contacting her attorney.  (Ramirez Dep. at 77:16-78:6.)

the door. (Plfs.' Ha Dep. at 73:25-74:2, 74:21-25.) Officer Lee and Young were standing back, but Officer Lee recalls Ms. Lam being angry and yelling at Young, calling him names and using expletives. (Plfs.' Lee Dep. at 47:7-11, 47:21-25, 48:6-24.) Young kept looking at Officer Lee and saying, "See what I'm dealing with? See what I have to go through?" (Plfs.' Lee Dep. at 49:2-3.)

Officer Ha explained that Young wanted to gather his belongings so he could be on his way, and Ms. Lam agreed. (Plfs.' Ha Dep. at 75:12-17.) Officer Lee recalls Ms. Lam saying, "I want him to get his shit and get the fuck out of my house." (Plfs.' Lee Dep. at 51:18-19.) Officer Ha states that Ms. Lam did not state that she did not want Young in her apartment, and was okay with the officers assisting in a civil standby. (Plfs.' Ha Dep. at 80:2-8.)

Young and the officers went inside to allow Young to gather his belongings. During the civil standby, Officer Ha remained with Ms. Lam in the hallway, while Officer Lee watched Young in Ms. Lam's bedroom. (Plfs.' Ha Dep. at 82:7-12.) Officer Lee states that Young remained in the door threshold, his back towards Officer Lee, and that Young was leaning over to grab things in a pile at his feet, including slacks, a dress shirt, and work shoes. (Plfs.' Lee Dep. at 56:2-15, 61:16-19.) Officer Lee did not search the items Young was taking. (Plfs.' Lee Dep. at 57:19-58:2, 62:19-23.) Officer Lee also did not instruct Young to shake out his shoes, although Young apparently did that himself to get his socks. (Plfs.' Lee Dep. at 62:24-63:4.) According to Officer Lee, Young was in the bedroom for seconds. (Plfs.' Lee Dep. at 63:23-25.) Young then went to the kitchen, searching for food and alcohol.

While Young and Officer Lee were in the kitchen, Sergeant Haskell arrived. (Plfs.' Lee Dep. at 66:15-19.) Sergeant Haskell states that he decided to go because Officers Lee and Ha were from a different unit, and if there was a report to be made, he did not want them to be stuck with it. (Plfs.' Haskell Dep. at 47:19-23.) Sergeant Haskell went up the stairs and saw Officer Ha in the hallway, and Ms. Lam, Officer Lee, and Young in the kitchen. (Plfs.' Haskell Dep. at 52:17-55:7.) Sergeant Haskell remained in the hallway while Young went back and forth, gathering his belongings. (Plfs.' Haskell Dep. at 54:21-25, 56:15-19.) He observed Young and Officer Lee going into Ms. Lam's bedroom, and that they were out of visual for around 30 seconds. (Plfs.' Haskell Dep. at 57:14-21.)

Young got his belongings, and he and Officer Lee went down the stairs, with Officer Ha following. (Plfs.' Haskell Dep. at 66:1-3.) Ms. Lam walked towards Sergeant Haskell, and he asked her if force was used. She told him, "No, he's not a bad guy. He only has a drinking problem." (Plfs.' Haskell Dep. at 66:6-11.) Sergeant Haskell explained that if there was any domestic violence, she could get a restraining order or the officers could get an emergency protective order, but Ms. Lam responded, "No, he's actually a nice guy. He just has a drinking problem." (Plfs.' Haskell Dep. at 66:12-18.) Sergeant Haskell did not inform Ms. Lam of her right to perform a citizen's arrest per § 836(b). (Plfs.' Haskell Dep. at 79:24-80:7.) They said good night, and Sergeant Haskell left. (Plfs.' Haskell Dep. at 66:2-24.)

Outside, Officer Lee talked to Young about how the relationship was not working, that Ms. Lam was pretty mad, and that it was maybe time for Young to find other love interests. (Plfs.' Lee Dep. at 70:4-7.) Young saw the cigarettes in Officer Lee's pocket and "asked . . . politely if he could have one." (Plfs.' Lee Dep. at 70:8-10.) Officer Lee gave Young a cigarette, and they continued to converse, with Young saying, "You can see what I'm dealing with. You can see how she talks to me. You can see how she treats me." (Plfs.' Lee Dep. at 77:12-17.) In general, Officer Lee recalls Young being very polite, never raising his voice above Officer Lee's level, and was all "please" and "thank you." (Plfs.' Lee Dep. at 77:25-78:12.) While Officer Lee and Young were conversing, Sergeant Haskell came down. (Plfs.' Lee Dep. at 70:10-11; Plfs.' Haskell Dep. at 71:1-4.) They talked for about five minutes, during which Sergeant Haskell observed Young to be "a pleasant person" who was "cooperative." (Plfs.' Haskell Dep. at 71:7-10.) Sergeant Haskell reminded Young that this was the second time he had gone back to 581 Natoma Street, and he warned Young that if Young came back a third time, hit Ms. Lam, or did anything else, he would be going to jail. (Plfs.' Haskell Dep. at 71:13-17.) Young responded that he understood, that he just wanted his stuff, and that he was done with her. (Plfs.' Haskell Dep. at 71:18-20.) Young then said his uncle was picking him up from Hayward and that he had work in the morning. (Plfs.' Haskell Dep. at 71:21-25.) The officers watched Young leave. (Plfs.' Lee Dep. at 86:19-25.)

Approximately forty minutes later, Young returned to 581 Natoma Street. He broke through the gate, kicked down the front door, and ran up the stairs. (McKay Dep. at 96:8-16,

Ramirez Dep. at 85:16-18.)  The last thing Mr. Ramirez heard Ms. Lam say was, "Oh, God." (Ramirez Dep. at 85:20-22.)  There were two shots.  (McKay Dep. at 96:20.)  Sergeant Haskell was among the police responders; he found Ms. Lam on her back, bleeding from the back of her head, and Young in the fetal position, also bleeding from the head.  (Plfs.' Haskell Dep. at 90:4-8.)  Sergeant Haskell performed CPR on Ms. Lam until the paramedics arrived.  (Plfs.' Haskell Dep. at 90:14-15.)  Outside the apartment, personal effects that appeared to belong to Young were strewn on the sidewalk, including clothing and a pair of men's shoes.  (Casper Decl., Exh. 21.)

Ms. Lam was taken to the hospital; she passed away on October 13, 2014.

**B.    Procedural History**

On August 11, 2015, Plaintiffs filed the instant case in state court, alleging claims of wrongful death and survivorship.  (Dkt. No. 1 at 7.)  On April 20, 2016, Plaintiffs filed a first amended complaint, adding a § 1983 claim for violation of Fourteenth Amendment Rights.  On May 13, 2016, Defendants removed the case to this court on the basis of federal question jurisdiction.  (Dkt. No. 1 at 2.)

On February 2, 2017, Defendants filed their motion for summary judgment.  Pursuant to the stipulated briefing schedule, Plaintiffs filed their opposition on March 2, 2017.  (Plfs.' Opp'n, Dkt. No. 31.)  On March 16, 2017, Defendants filed their reply.  (Defs.' Reply, Dkt. No. 32.)

**II.    LEGAL STANDARD**

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when, after adequate discovery, there is no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law. *Id.*; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id*.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that

demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Southern Calif. Gas. Co. v. City of Santa Ana,* 336 F.3d 885, 888 (9th Cir. 2003).

On an issue where the nonmoving party will bear the burden of proof at trial, the moving party may discharge its burden of production by either (1) "produc[ing] evidence negating an essential element of the nonmoving party's case" or (2) after suitable discovery, "show[ing] that the nonmoving party does not have enough evidence of an essential element of its claim or defense to discharge its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000); *see also Celotex*, 477 U.S. at 324-25.

Once the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *See* Fed. R. Civ. P. 56(e); *Anderson,* 477 U.S. at 250. "A party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001). "Instead, the non-moving party must go beyond the pleadings and by its own evidence set forth specific facts showing that there is a genuine issue for trial." *Id.* (citations and quotations omitted). The non-moving party must produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan v. NMS Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). Conclusory or speculative testimony in affidavits and moving papers is insufficient to raise a genuine issue of material fact to defeat summary judgment. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Electronics Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

In deciding a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *Anderson,* 477 U.S. at 255; *Hunt v. City of Los Angeles,* 638 F.3d 703, 709 (9th Cir. 2011).

### III.    DISCUSSION

**A.    Negligence Claim**

In California, "there is no common law tort liability for public entities in California;

instead, such liability must be based on statute." *Guzman v. Cty. of Monterey*, 46 Cal. 4th 887, 897 (2009) ("Except as otherwise provided by statute: [¶] A public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity of a public employee or any other person") (quoting Cal. Gov. Code § 815(a)). One such statute is California Government Code § 815.6, which states:

> Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty.[5]

To establish liability under California Government Code § 815.6, the plaintiff must first establish that "the enactment at issue be *obligatory*, rather than merely discretionary or permissive, in its directions to the public entity; it must *require*, rather than merely authorize or permit, that a particular action be taken or not taken." *Guzman*, 46 Cal. 4th at 898. Second, the mandatory duty must "be 'designed' to protect against the particular kind of injury the plaintiff suffered," such that "the injury is one of the consequences which the enacting body sought to prevent through imposing the alleged mandatory duty." *Id.* This inquiry goes to the legislative purpose of imposing the duty. *Id.* Finally, the breach of the duty must be "a proximate cause of the plaintiff's injury." *Id.*

### i. Mandatory Duty

Here, Plaintiffs identify California Penal Code § 836(b) as imposing the requisite mandatory duty. (FAC ¶ 47.) Defendants argue that Plaintiff's theory of liability fails because: (1) § 836(b) does not establish a mandatory duty; (2) even if § 836(b) created a mandatory duty, such duty did not arise in this case because there was no probable cause to support a citizen's arrest; (3) even if a mandatory duty was breached, the breach did not proximately cause Ms. Lam's death;

---

[5] Another such statute is § 815.2, which makes a public entity "liable for injury proximately caused by act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative"). As discussed below, however, Plaintiffs cannot establish proximate cause in the instant case.

United States District Court
Northern District of California

and (4) any liability based on California Government Code § 815.6 is barred by statutory immunity. (Defs.' Mot. at 8.) Defendants do not dispute that the duty in dispute is "designed" to protect against the kind of injury suffered by Ms. Lam.

Although the issue of whether § 836(b) imposes a mandatory duty is an intriguing one, the Court ultimately concludes that it need not decide this question because regardless, Plaintiffs are unable to establish proximate causation, as discussed below.

### ii.    Proximate Causation

"[P]roximate cause reflects a judgment regarding the permissible extent of liability for negligence. It limits the defendant's liability to those foreseeable consequences that the defendant's negligence was a substantial factor in producing." *Mendoza v. City of L.A.*, 66 Cal. App. 4th 1333, 1342 (1998). "[P]roximate cause is generally considered a question of fact for determination by a jury." *Pipitone v. Williams*, 244 Cal. App. 4th 1437, 1459 (2016). Where, however, "the facts are such that the only reasonable conclusion is an absence of causation, the question is one of law, not of fact." *Id.* (internal quotations omitted).

Defendants cite to *Whitcombe v. County of Yolo*, 73 Cal. App. 3d 698 (1977) and *Fleming v. California*, 34 Cal. App. 4th 1378 (1995). In *Whitcombe*, Daniel Gibson pled guilty to a charge of first degree robbery, after which he was diagnosed with various psychiatric diseases. *Whitcombe*, 73 Cal. App. 3d at 702-03. When released on probation, he was arrested and charged with theft. *Id.* at 703. The plaintiffs assisted in the investigation. After Gibson was released from custody, he assaulted and severely injured both of the plaintiffs. *Id.* The plaintiffs then sued, arguing that the defendant county had failed to undertake certain ministerial acts to investigate the accusations leading to Gibson's arrest, neglected to confer with anyone to decide if his probation should be revoked, and neglected to determine whether he constituted a danger to society. *Id.* The Court of Appeal found that there was no proximate causation because ultimately, the decision to grant or revoke probation was "within the discretion of the trial court," who was not bound by the report and recommendation of the probation officer. *Id.* at 708. Given this "latitude accorded to the trial court," the argument that the defendants' failure to present reports precluded the trial court from revoking Gibson's probation was "specious," as the court ultimately had no obligation to

15

revoke probation. *Id.*

Similarly, in *Fleming*, Frank Atwood was paroled from state prison. 34 Cal. App. 4th at 1381. Atwood's father informed Atwood's parole officer that Atwood had left the state without permission, and had been alone with a five-year old child, to whom he had sent a sexually explicit postcard. *Id.* at 1382. Atwood then again left the state, violating parole. The parole officer searched Atwood's room in California and found child pornography, but took no steps to have Atwood arrested. While in another state, Atwood kidnapped and killed the decedent. *Id.* The decedent's family sued, arguing that the defendants had failed to arrest Atwood under California Penal Code § 3059, which provides that a paroled prisoner who leaves the state without permission "shall be held as an escaped prisoner and arrested as such." *Id.* at 1383. The Court of Appeal found that there was no proximate causation because "the failure to arrest Atwood was not in itself a cause of the injury, since arrest without a period of incarceration would not necessarily have prevented the crime." *Id.* at 1384. Incarceration, in turn, "would have involved procedural steps involving the exercise of discretion and thus have broken the causal chain." *Id.*

Plaintiffs respond by pointing to *Landeros v. Flood*, 17 Cal. 3d 399 (1976). There, the attending physician had failed to report suspected child abuse pursuant to CANRA where the child was brought with unexplained injuries, demonstrated fear and apprehension when approached, and exhibited symptoms of battered child syndrome. *Id.* at 405-06. The child was returned to the custody of her mother and her mother's common law husband, who resumed physically abusing her until she suffered severe injuries resulting in permanent physical injuries and significant mental distress. *Id.* at 406. The California Supreme Court found that the intervening acts of the mother and common law husband did not relieve the defendant of liability if the injuries were "reasonably foreseeable." *Id.* at 411. Foreseeability, in turn, was a question of fact for the jury. Thus, the plaintiff was entitled to prove by expert testimony that the defendants should reasonably have foreseen that the mother and common law husband were likely to resume their physical abuse and inflict further injuries if she was returned to their custody. *Id.*; *see also Alejo v. City of Alhambra*, 75 Cal. App. 4th 1180, 1191-92 (1999) (finding that where the defendant officer failed to investigate or cross-report allegations of child abuse, the plaintiffs were entitled to prove by

16

expert testimony that a reasonably prudent social worker would have responded to reported child abuse in a way that would have prevented subsequent injuries).[6]

Recently, in *State Department of State Hospitals v. Superior Court*, the California Supreme Court found that "proximate cause is absent as a matter of law" where Gilton Pitre was paroled from state prison, rather than being civilly committed under the Sexually Violent Predators Act ("SVPA"), and went on to rape and murder the plaintiff's sister. 61 Cal. 4th at 339, 343 (2015). The plaintiff sued for failure to discharge mandatory duties. The California Supreme Court found there were sufficient allegations that the defendants had breached their duty to conduct an SVPA evaluation with two evaluators. *Id.* at 350. It held, however, that this breach of mandatory duty did not proximately cause the decedent's death, looking at "a line of cases [that a]ll held that proximate cause was not established when a governmental defendant's failure to act allegedly caused injury, but the chain of causation included discretionary determinations for which no liability could be imposed." *Id.* at 353. Applying this principle, the California Supreme Court found that while there was a mandatory duty to use two evaluators, "the details of the *manner* in which each evaluator conducts the review are discretionary." *Id.* at 355. Further:

> the second evaluation would have had to disagree with the first and conclude that Pitre was an SVP [Sexually Violent Predator]; two independent evaluators would then have had to agree that he was an SVP; the designated counsel would have had to make a discretionary decision to file a civil commitment petition; and the trial court would have to have made a discretionary probable cause determination. Ultimately, the trier of fact would have had discretion to deny the petition.

*Id.* The California Supreme Court thus agreed that the plaintiff failed to show proximate causation because "[a]s a matter of cause in fact it is conjectural, depending on a long series of determinations that would have been required after [the defendants'] breach in order for the injury to have been prevented." *Id.*

Relying on *State Hospitals*, the Court of Appeal in *Pipitone* found there was no proximate

---

[6] Plaintiffs also cite to *Motley v. Smith*; there, however, the district court simply concluded that there were sufficient allegations to survive a motion to dismiss. No. 1:15-cv-905, 2016 WL 6988597, at *7 (E.D. Cal. Nov. 28, 2016). The district court did not consider the issues of foreseeability or the existence of discretionary actions that could break the chain of causation.

cause where medical doctors failed to report child abuse that led to the death of the plaintiff's

daughter, who was married to the murderer. There, the decedent was examined by two doctors

when the decedent's husband deliberately ran over her foot with his car. 244 Cal. App. 4th at

1440. Following the examination, and after other abusive acts, the decedent's mother and sister

called the police to report the suspected abuse. *Id.* at 1442. The police investigated, and the

decedent admitted that her husband had deliberately run over her, that she felt threatened by her

husband, that he had guns and other illegal things, and that he would come after her and her family

if she said anything. *Id.* She told the police officer that she did not want to talk with law

enforcement. The officer forwarded his report to the department and sheriff's office, but no further

police intervention occurred. A few months later, the decedent's husband murdered her.

The Court of Appeal found that while proximate causation was generally a question of

fact, there was no dispute about the absence of causation in the case. *Id.* at 1459. Although the

plaintiff pointed to *Landeros*, the Court of Appeal distinguished that case, explaining that it "did

not involve a series of discretionary determinations that necessarily formed the basis of proximate

causation." *Id.* at 1461 (internal quotation omitted). In *Landeros*, the reporting of the child abuse

"would likely have had an immediate effect on whether the infant was returned to the custody of

her potential abusers," particularly as the victim would not have dissuaded an investigation by law

enforcement. *Id.* In contrast, even assuming that the doctors reporting the decedent's abuse would

have prompted an investigation different from the one that actually took place, "the inquiry by law

enforcement would have been only the first step in a necessary chain of discretionary decisions by

the police or sheriff's department, which would have had to culminate in the arrest and detention

of [the decedent's husband]." *Id.* at 1461-62.

In light of this authority, the Court finds that Plaintiffs cannot establish proximate

causation as a matter of law. As Defendants point out, there are a number of decisions that would

have to be made to ensure that Young would not be in a position to murder Ms. Lam. First, Ms.

Lam would have had to choose to make the citizen's arrest. (Defs.' Reply at 11.) From there, a

number of discretionary steps would have to be made. Second, assuming Ms. Lam chose to make

a citizen's arrest, the officers would then have to decide whether to receive Young into custody.[7]

Third, even if the officers received Young into custody, they would then have discretion to release

Young under California Penal Code § 849(b), which permits a peace officer to release from

custody an individual arrested without a warrant by an officer or private person, when "[t]he

officer is satisfied that there are insufficient grounds for making a criminal complaint against the

person arrested."  Fourth, if the officers instead decided to take Young into custody, Defendants

contend (and Plaintiffs did not contradict) that the sergeant would have to review the charges and

decide whether to book Young or release him.  Fifth, should Young be booked, a judicial officer

would then have to decide whether Young could be released on bail or further detained.  Thus, as

in *Pipitone*, Ms. Lam's decision to perform the citizen's arrest "would have only been the first step

in a necessary chain of discretionary decisions . . . which would have had to culminate in the arrest

and detention" of Young for a period long enough for Ms. Lam to receive a protective order.[8]  244

Cal. App. at 1461-62; *see also Fleming*, 34 Cal. App. 4th at 1384 (finding that the failure to arrest

"was not in itself a cause of the injury, since arrest without a period of incarceration would not

necessarily have prevented the crime").  As in *Whitcombe*, *Fleming*, *State Hospitals*, and *Pipitone*,

many of the decisions regarding whether to arrest and detain Young, and for what period of time,

are discretionary decisions that break the causal chain, and necessitate a finding that there is no

proximate causation as a matter of law.

The opinion of Chief Susan Jones is not to the contrary; for example, Chief Jones states

---

[7] California Penal Code § 142(a) makes it a crime for a peace officer to "willfully refuse[] to receive or arrest" "a person charged with a criminal offense."  Section 142 originally applied to the subject of citizen's arrests.  *See Kinney v. Cty. of Contra Costa*, 8 Cal. App. 3d 761, 767 (1970) ("The subject of a citizen's arrest is a 'person charged with a criminal offense'").  Section 142 has since been amended to read: "(c) This section shall not apply to arrests made pursuant to Section 837."  Section 837, in turn, concerns arrests by private persons, *i.e.*, citizen's arrests.  Thus, California Penal Code § 142's requirement that an officer receive an individual charged with a criminal offense no longer applies to citizen's arrests.

At the hearing, Plaintiffs argued that the Defendant officers would be required to take Young into custody if Ms. Lam had performed a citizen's arrest, but pointed to no legal authority in support.

[8] The protective order is also not a period of incarceration; thus, even if Ms. Lam obtained one, there was no way to ensure that Young would not violate it just as he violated the officer's command to not return to Ms. Lam's residence or face going to jail.

that as to the first officers' response, Ms. Lam could have made a citizen's arrest of Young, and Young could then have been "held for a period of time that would allow the officers to obtain an Emergency Protective Order. Young could have been served with the order while in custody, giving the officers something for which to arrest him should he go back to the apartment once he was released." (Jones Decl. ¶ 19, Dkt. No. 30; *see also* Jones Decl. ¶¶ 24, 36.) As discussed above, many of these decisions are discretionary, in addition to the decision of a judge to issue the emergency protective order. *See Nakamura v. Parker*, 156 Cal. App. 4th 327, 334 (2007) (noting that the "trial court is vested with discretion to issue a protective order under the [Domestic Violence Protection Act]").

Because Plaintiffs cannot establish proximate causation as a matter of law, the Court GRANTS Defendants' motion for summary judgment as to the negligence claims. Because the negligence claims fail, the survivorship claim necessarily fails.[9]

## B.    Section 1983 Claim

"Section 1983 provides a cause of action against any person who, under the color of state law, abridges rights unambiguously created by the Constitution or laws of the United States." *Crowley v. Nevada*, 678 F.3d 730, 734 (9th Cir. 2012) (internal quotations and citations omitted). It "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Id.* (internal quotations and citations omitted). Thus, to state a claim under § 1983, a plaintiff must allege two elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

Here, Plaintiffs assert a § 1983 claim against Defendants Officer Lee, Officer Ha, and

---

[9] Defendants argue that they are immune from liability under California Government Code § 821.6. (Defs.' Mot. at 19.) Defendants acknowledge, however, that the Court is bound by *Garmon v. County of Los Angeles*, where the Ninth Circuit held that California Government Code § 821.6 applied only to malicious prosecution claims. 828 F.3d 837, 847 (9th Cir. 2016). *Garmon* relied on "the California Supreme Court interpret[ion of] section 821.6 as 'confining its reach to malicious prosecution actions.'" *Id.* (quoting *Sullivan v. Cty. of L.A.*, 12 Cal. 3d 710, 720 (1974)). While the Ninth Circuit acknowledged that California appellate courts had been interpreting California Government Code § 821.6 more expansively, it concluded that "the California Supreme Court would adhere to *Sullivan* even though California Courts of Appeal have strayed from it." *Id.* The Court therefore would have concluded that statutory immunity does not apply in this case.

Sergeant Haskell for violation of their Fourteenth Amendment rights to familial association. (FAC ¶¶ 59-62.) "As a general rule, members of the public have no constitutional rights to sue state employees who fail to protect them against harm inflicted by third parties." *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992); *see also Deshaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989) ("a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause"). Two exceptions to this general rule exist: the "special relationship" exception and the "danger creation" exception. *L.W.*, 974 F.2d at 121. Here, Plaintiffs rely on the "danger creation" exception. (Plfs.' Opp'n at 23.)

"The 'danger creation' basis for a claim . . . necessarily involves affirmative conduct on the part of the state in placing the plaintiff in danger." *Id.* Plaintiffs assert two bases for the application of the "danger creation" basis in this case. Plaintiffs argue that "[t]here is strong circumstantial evidence that Young had 'stashed' the murder weapon in the pair of men's shoes that he collected from [Ms. Lam]'s room." (Plfs.' Opp'n at 24.) As evidence, Plaintiffs point to Young's "single-minded focus on gaining access back into the apartment," claiming that he needed clothing even though McKay had already provided him with a bag of clothing. (*Id.*) Young also did not have a gun when he was released from County Jail. After he was released, "[h]e immediately returned to the apartment and created a ruse to gain entry into the apartment, which was facilitated by the officers." (*Id.*) Finally, the items that he retrieved, including the men's shoes, were found immediately outside of the apartment. (*Id.*) Plaintiffs also appear to suggest that because the civil standby allowed Young to get the weapon, he was "emboldened" to later break down the door and attack Ms. Lam. (*Id.* at 25.)

The Court finds that this argument is speculative. As an initial matter, there is evidence that Ms. McKay saw Young with a gun outside of the apartment, prior to Young's arrest for public intoxication. (McKay Dep. at 81:3-5; Defs.' McKay Dep. at 97:3-23.) But even assuming this is a question of disputed fact, Plaintiffs have still failed to present any evidence that Young retrieved the gun from Ms. Lam's room; for example, there is no evidence that he even possessed or owned a gun and left it in Ms. Lam's room to begin with. As Defendants pointed out at the hearing, there is also no evidence that the gun Plaintiffs believe was in Young's shoes could even fit in the shoes,

especially when there were already socks in them. (Plfs.' Lee Dep. at 62:24-63:4.) Plaintiffs can only hypothesize that Young actually got a gun during the civil standby based on Young not having a gun during the pat downs, Young wanting to get into the apartment despite already having clothing, and because the men's shoes were found with other items outside of the apartment when the shooting occurred. That is not, however, a reasonable inference for a jury to make from this proffered evidence, and such speculative conclusions are insufficient to survive summary judgment. *Compare with Day v. Cty. of Contra Costa*, No. C07-4335 PJH, 2008 WL 4858472, at *12, 14 (N.D. Cal. Nov. 10, 2008) (finding the plaintiff's argument that the officer hit his head on an air conditioner rather than being hit by the decedent was speculative because the only evidence in support was the presence of the air conditioner and declarations by two witnesses who did not see the event but heard a banging sound, which they believed was "possib[ly] someone running into the air-conditioning unit"); *see Nelson v. Prima Cmty. Coll.*, 83 F.3d 1075, 1081 (9th Cir. 1996) ("mere allegations and speculation do not create a factual dispute for purposes of summary judgment"); *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment"). Instead, it is equally likely that Young obtained a gun when he left Natoma Street the last time, or that he hid the gun that Ms. McKay saw him with in the courtyard somewhere outside of the apartment.[10] Thus, the Court concludes that there is insufficient evidence to support a finding that Young did in fact get a gun during the civil standby, therefore increasing the danger to Ms. Lam.[11]

Because there is no non-speculative evidence that Young retrieved the gun during the civil

_____

[10] Indeed, there is arguably more evidence in support of Young having hidden the gun, given Ms. McKay's deposition testimony, than Plaintiffs' supposition that Young obtained the gun during the civil standby. (McKay Dep. at 80:13-22, Defs.' McKay Dep. at 97:3-9.)

[11] As Defendants also point out, assuming the gun really was in Ms. Lam's room, Young would still have had access to the weapon when he broke in even if he had not retrieved it during the civil standby, thus still allowing him to fatally shoot Ms. Lam. (Defs.' Mot. at 23.) While Plaintiffs suggest that Young's retrieval of the gun during the civil standby "emboldened" him to later break down the door and attack Ms. Lam, the argument that Young was "emboldened" is also speculative at best (and perhaps contradicted by the fact that Young had already returned to Ms. Lam's apartment four times prior to the fatal shooting, each time trying to make his way into the apartment), and unsupported by any evidence. (*See* Plfs.' Opp'n at 25.)

United States District Court
Northern District of California

standby, the Court concludes that Plaintiffs have not established sufficient facts to raise a triable dispute on whether the "danger creation" exception applies. Plaintiffs' § 1983 claim therefore fails, and the Court GRANTS Defendants' motion for summary judgment on this claim.

## IV.    CONCLUSION

As the parties all acknowledge, this is a tragic case. That fact alone, however, does not mean that Defendants are legally liable for Ms. Lam's death. Thus, for the reasons stated above, the Court GRANTS Defendants' motion for summary judgment.

IT IS SO ORDERED.

Dated: June 14, 2017

_____
KANDIS A. WESTMORE
United States Magistrate Judge